UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

1

2

3  UNITED STATES OF AMERICA,       )  Case No. 4:11-cr-00010-04-RRB
                                   )
4              Plaintiff,          )  Fairbanks, Alaska
                                   )  Thursday, December 29, 2011
5          vs.                     )  1:16 o'clock p.m.
                                   )
6  ANTHONY GADSON,                 )  **IMPOSITION OF SENTENCE**
                                   )
7              Defendant.          )
                                   )
8  _____)

9                    **TRANSCRIPT OF PROCEEDINGS**

10         BEFORE THE HONORABLE RALPH R. BEISTLINE
11          UNITED STATES CHIEF DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:           ELIZABETH F. CRAIL, ESQ.
                                 Assistant U.S. Attorney
14                               U.S. Attorney's Office
                                 101 12th Avenue, Room 310
15                               Fairbanks, Alaska   99701
                                 (907) 451-5970
16
    For the Defendant:           STONEWALL JASON CRAWFORD, ESQ.
17                               Crawford Law Offices
                                 250 Cushman Street, Suite 2B
18                               Fairbanks, Alaska   99708
                                 (907) 474-0775
19
    Probation Officer:           MARCI LUNDGREN
20                               U.S. Pretrial Service/Probation
                                    Office
21                               101 12th Avenue, Room 322
                                 Fairbanks, Alaska   99701
22                               (907) 456-0266
23
    Court Recorder:              JODY EVANS
24                               U.S. District Court
                                 101 12th Avenue, Room 332
25                               Fairbanks, Alaska   99701
                                 (907) 451-5792

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota 58501-2772
(701) 255-1054 • nodak@btinet.net

```
1    Transcription Service:        NODAK ROSE TRANSCRIPTS
                                   721 North 19th Street
2                                  Bismarck, North Dakota  58501
                                   (701) 255-1054
3

4    Proceedings recorded by electronic sound recording.
     Transcript produced by transcription service.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    FAIRBANKS, ALASKA - THURSDAY, DECEMBER 29, 2011

2         (Call to Order of the Court at 1:16 p.m.)

3         (All parties present; defendant present)

4         THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is now

6    in session, the Honorable Ralph R. Beistline presiding.

7    Please be seated.

8         THE COURT:  Okay.  We're on the record.  <u>United</u>

9    <u>States of America v. Gadson</u>, Case 4-11-10, continuation of a

10   sentencing.  Is the Government ready?

11        MS. CRAIL:  Yes, Your Honor.

12        THE COURT:  Mr. Crawford, ready?

13        MR. CRAWFORD:  Yes, sir.

14        THE COURT:  And we have a probation officer here.

15   Okay.  Just by way of review, the Court noted that it was

16   October 11th of 2011 that defendant was found guilty of count

17   one of the First Superseding Indictment, drug conspiracy;

18   count -- count two, which was possession with intent to

19   distribute controlled substance; and count three, which was

20   possession of a firearm in furtherance of a drug offense; and

21   was found not guilty of count five, which was conspiracy to

22   retaliate against a witness.

23        Based thereon, the Court ordered a presentence

24   report.  That has been prepared and filed.  We discussed it

25   last week.  Since that time, there have been some additional

1   objections filed which I have had an opportunity to review in

2   detail, and I presume the Government has a copy of that

3   document as well?

4           MS. CRAIL:  Yes, Your Honor.  I do.

5           THE COURT:  And the probation officer got a chance

6   to review it?

7           THE PROBATION OFFICER:  Yes, Your Honor.

8           THE COURT:  And the understanding was that you were

9   going to respond orally, not in writing, to the objections?  I

10  have been able to run through them.  How do you want to

11  proceed with that?  Do you want to go -- let the probation

12  officer go first or let the Government respond?  Any

13  preference?  Did you -- are you prepared to say anything?

14          THE PROBATION OFFICER:  Your Honor, I certainly can

15  if you want me to --

16          THE COURT:  Okay.  Might as well go right down the

17  list.  You've got it in your hands.  Okay.

18          THE PROBATION OFFICER:  I do, Your Honor.

19          THE COURT:  If everyone would follow with her.

20  Okay.

21          THE PROBATION OFFICER:  I would note, I guess, the

22  first one with the name as far as Bill Gadson.  It does appear

23  that the officer who wrote the report -- that that name is

24  inaccurate and it should certainly be Anthony Gadson.

25          THE COURT:  Okay.

1    THE PROBATION OFFICER:  So, we'd agree with that.

2   I'll leave it to the Court's discretion as to -- I mean, in

3   the recommendation, that officer went through whether or not

4   he had much contact with the police.

5        THE COURT:  Okay.

6        THE PROBATION OFFICER:  And I'll let the Court

7   review that.  It's (indiscernible - simultaneous speakers) --

8        THE COURT:  Well, you know, it's clear what his

9   contact is.

10        THE PROBATION OFFICER:  Right.

11        THE COURT:  The officer said most of his adult life

12   that -- you know, some of his adult life, most of his -- it

13   doesn't matter, it doesn't impact the sentence.

14        THE PROBATION OFFICER:  Yes, Your Honor.

15        THE COURT:  Okay.  Next?

16        THE PROBATION OFFICER:  And I would agree, the

17   recommendation -- counts one and two should run concurrently

18   to each other is what the recommendation says.  That's

19   correct.

20        THE COURT:  Okay.

21        THE PROBATION OFFICER:  That count three must by

22   statute run consecutive to whatever is imposed in count one

23   and two.

24        THE COURT:  Okay.  Mr. Crawford, speak up if you

25   have anything to add, okay?  I expect the Government to speak

1    up as well.  Go ahead.

2              THE PROBATION OFFICER:  The next as far as whether

3    or not the ABADE investigators knew that Anthony Gadson --

4    that's really not relevant to sentencing.

5              THE COURT:  Right.  And I recall the testimony that

6    Mr. Vokelander (ph) did -- did believe that Ant was Mr.

7    Haynes.  I'm not sure that the investigators were so misled,

8    but I certainly know -- understand that.

9              MS. CRAIL:  Right.  And Your Honor, just briefly

10   from the Government.  There's nothing incorrect about the

11   paragraph, however, because the investigators did know that

12   Ant was --

13             THE COURT:  Right.

14             MS. CRAIL:  -- in fact Anthony Gadson.  They just

15   had a -- had a confusion between who Mr. Vokelander believed

16   to be Ant --

17             THE COURT:  Right.

18             MS. CRAIL:  -- versus them.

19             THE COURT:  Mr. Vokelander thought that Mr. Haynes

20   was Ant --

21             MS. CRAIL:  Right.

22             THE COURT:  -- the investigators knew who Ant was.

23             MS. CRAIL:  Correct.  Right.

24             THE COURT:  Okay.  All right.

25             MS. CRAIL:  But I think that's clear on the record.

1        THE COURT:  And when Mr. Vokelander was saying I

2   bought it from Ant, he really meant he bought it from Mr.

3   Haynes.

4        MS. CRAIL:  Joshua Haynes.  Yes, sir.

5        THE COURT:  Joshua Haynes.  Gotcha.  So, we

6   understand.  Okay.  Next.

7        THE PROBATION OFFICER:  All right.  As far as

8   Paragraph 43, it does not indicate that any drugs were found

9   in that vehicle.  Mr. Crawford wanted it emphasized that no

10  drugs were found in the vehicle.  I think it's implicit in

11  that it didn't -- it didn't imply that there were drugs.

12       THE COURT:  That's true.  I'm sure it would have

13  said so if there had been.

14       THE PROBATION OFFICER:  Yes, Your Honor.  And then

15  as far as Brandon Hayes admitting to investigators in

16  September of 2011 that he put thirty-eight thousand four

17  hundred and thirty [$38,430] in the garage, I would defer to

18  the agents as far as specifically when and how Mr. Haynes

19  indicated that thirty-eight thousand dollars in the garage.

20       But as far as the relevant conduct to the

21  guidelines, it's the position of the probation office that

22  regardless of whether Mr. Haynes put that thirty-eight

23  thousand dollars in there or whether Mr. Gadson did or whether

24  Mr. Gadson even knew that it was there, that there's -- was

25  certainly enough evidence that was presented at trial and by

1    two investigators, one in Paragraph 72:

2              "CS-5 indicated that he had seen Haynes give Gadson

3              forty to fifty thousand dollars on two different

4              occasions."

5    This is part of, certainly, reasonably foreseeable to Mr.

6    Gadson.

7              So, it's noted that Mr. Haynes refused to test --

8    didn't testify against his brother and now he's saying, you

9    know, okay, I'll take the heat for that.  So, I just note

10   that, Your Honor.

11             THE COURT:  But he's not really saying that now.  He

12   said it out of court in a hearsay statement allegedly.  Yes?

13             MS. CRAIL:  Correct, Your Honor.  And if -- and our

14   position is if the Court is going to consider that, then the

15   Government believes that additional information needs to be

16   provided to put the statement in context.

17             THE COURT:  I'm not going to consider that.

18             MR. CRAWFORD:  Your Honor, (indiscernible -

19   simultaneous speakers).

20             THE COURT:  Why would I consider that?  That's a

21   hearsay statement --

22             MS. CRAIL:  Right.

23             THE COURT:  -- that's not --

24             MR. CRAWFORD:  There were a lot -- Your Honor, there

25   were a lot of statements in this report from confidential

1  informants that are hearsay.

2          THE COURT:  Okay.  I'll address --

3          MR. CRAWFORD:  I'm just trying to address each of

4  them because I think that they -- they are relevant if you're

5  going to listen to the other confidential informants.

6          THE COURT:  Okay.  All right.  So --

7          THE PROBATION OFFICER:  As far as Paragraph 53, Your

8  Honor --

9          THE COURT:  Well, let me get this squared away.

10  We've got -- Paragraph 45, "Mr. Haynes admitted to

11  investigators on September 11th, that he put" -- now,

12  September 11th.  He also on an earlier occasion had other

13  things to say that -- I don't know if it's relevant to that,

14  but the point is he didn't testify to this at trial.  He was

15  here, he was in the building, and chose not to testify.  I

16  can't -- I don't know how I can accept that.  What more were

17  you saying?  Did I interrupt you?

18          MS. CRAIL:  Oh, no, sir.  I was just saying that if

19  -- if the Court wish -- wishes to consider that particular

20  statement of Mr. Haynes, the Government believes additional

21  evidence needs to be presented to -- as to the context of it

22  because we believe that it is -- contextually, it's part of

23  Mr. Haynes' attempts to cover for Mr. Gadson --

24          THE COURT:  Right.

25          MS. CRAIL:  -- right before trial, and his -- his

1   immense unwillingness to testify against his brother.

2           THE COURT:  I'm aware of that, but if you feel it's

3   necessary to make a record of it, I don't mind.

4           MS. CRAIL:  I think there is some -- there are some

5   additional facts which would be good to have on the record

6   unless the Court is simply disregarding the statement

7   entirely.

8           THE COURT:  Well, listen, I want the record to be as

9   clear as possible.  I am aware of Mr. Haynes' situation.  I'm

10  aware he was going to testify and then he just couldn't do it.

11          MS. CRAIL:  Mm-hmm (affirmative).

12          THE COURT:  I'm aware -- and he made earlier

13  statements, and I'm aware he had a plea agreement, so he could

14  have come in here and testified freely, but he couldn't

15  testify wrongfully.  He couldn't commit perjury, and that was

16  his dilemma.

17          MS. CRAIL:  Right.  And Your Honor, if I may, what

18  -- what I'll do is I'm going to -- let me just lay out briefly

19  an offer of proof.  I have --

20          THE COURT:  Okay.  Why don't you do that.

21          MS. CRAIL:  -- two investigators here who can

22  testify.  Basically the gist of it is when Investigator

23  Thompson contacted Mr. Haynes initially at the end of July and

24  arrested him --

25          THE COURT:  Of what year?

1          MS. CRAIL:  Of 2011.

2          THE COURT:  Okay.

3          MS. CRAIL:  This was -- this was getting him in

4     custody on this case --

5          THE COURT:  Okay.

6          MS. CRAIL:  -- with the warrant out -- outstanding.

7     He told Mr. Gad -- or he told Mr. Haynes that Mr. Gadson was

8     -- was basic -- he'd been indicted, too, and that he was in

9     trouble, and among other things, he commented to Mr. Haynes

10    that the police had retrieved approximately forty thousand

11    dollars out of Mr. Haynes' garage and he was, therefore, in --

12    basically in a lot of trouble.  And Mr. Haynes' response to

13    that was, yes, he's in a lot of trouble, rather than, hey,

14    wait a minute, that's my forty thousand dollars that I hid in

15    there.  And he sounded somewhat -- according to Investigator

16    Thompson, somewhat surprised to learn that the -- that that

17    money had been found in Mr. Gadson's garage.

18          Obviously, if it was in fact Mr. Haynes that had

19    stowed it there deliberately only a couple months before in

20    order to hide it, and given the context that he had already

21    back in November and again made statements in July to the

22    effect that he was taking responsibility for everything he did

23    -- he was taking responsibility for the kilograms, he was

24    taking responsibility for all that -- there would have been no

25    reason for him to have not taken responsibility for that money

1    if in fact it had actually been his at that point.  So, that's

2    a particularly important piece of context.

3         The other piece of context is something that the

4    Court has a rough idea of with respect to Mr. Haynes' dilemma,

5    but ultimately those last interviews prior to trial, the gist

6    of -- of the interviews was that Mr. Hayes kept indicating

7    that he did not want to testify against Mr. Gadson; Mr. Gadson

8    had behaved as a father figure to him and his brothers, had

9    made Christmases for them.

10         He broke down in tears on numerous occasions, and

11   his reiteration was invariably you have enough evidence

12   without me to convict Mr. Gadson, which in fact turned out to

13   be true, why do you need my testimony?  Why do I have to

14   testify?  It's my brother, I -- I -- I don't -- I really can't

15   testify against him.  He indicated he knew that Mr. Gadson was

16   a drug dealer, but he just could not bring himself to do so.

17         THE COURT:  I picked that up from Mr. Cooper's

18   comments during trial.

19         MS. CRAIL:  So, that's --

20         THE COURT:  You may not have been in the room, but I

21   -- I picked that up.

22         MS. CRAIL:  Okay.  That's the -- that's the gist of

23   it, and that would be -- that's the offer of proof, that's

24   what the investigators would say, or at least the rough

25   overview.

1    THE COURT:  You know, you haven't told me anything I

2  haven't become aware of during the course of the trial and

3  especially -- okay.

4    MS. CRAIL:  So, with those -- with those

5  clarifications, it -- I -- it is in fact correct Mr. Haynes

6  did, right shortly before trial there, make a statement to the

7  effect that he had stowed that thirty-eight thousand dollars

8  in the garage.  In the context, however, given his previous

9  statements in July and the -- the circumstances during which

10  the statement was made, the Government believes that it is an

11  inherently unreliable statement as far as --

12    THE COURT:  Even if it were, it's not going to

13  impact the sentence.

14    MS. CRAIL:  I understand, sir.  I just wanted for

15  the record to be clear.

16    THE COURT:  Okay.  The record is clear.  It's clear

17  Mr. Crawford believes that it's a significant piece of

18  evidence that was not presented to the jury, I have -- I'm

19  aware that Mr. Haynes in September made this comment, I'm

20  aware of his prior general comments.  I've seen him, he's done

21  a change of plea in front of me, I have his file, I know about

22  him.  So -- okay, I think I have enough there.  I don't think

23  we have to change or add there, but we're taking away from the

24  probation officer, taking her time.  Go ahead.

25    THE PROBATION OFFICER:  No, no worries, Your Honor.

1    All right.  As far as Paragraph 53 indicates, counsel has said

2    that the phone call stage, Gadson said there was no strap,

3    meaning gun, at the house, which is backed by the evidence

4    that no gun was found at -- there certainly was no gun

5    found --

6                THE COURT:  True.

7                THE PROBATION OFFICER:  -- and I would agree that

8    that was stated, although it wasn't in this portion of the

9    report; that Mr. Gadson did say that on the phone, that there

10   was no strap.  He did, however, refer to the fact that they

11   got the money --

12               THE COURT:  I know that.

13               THE PROBATION OFFICER:  -- in that same paragraph.

14               THE COURT:  And I also know that there was no gun

15   found.

16               THE PROBATION OFFICER:  Correct.  There was no gun

17   found.  He did indicate that on the record.

18               MR. CRAWFORD:  That was my point, Your Honor, that

19   it said there was a gun and there wasn't.

20               THE COURT:  Right.  And that was either an error or

21   mistake of some sort, but I know there was no gun found.

22   Okay.  Next.

23               MS. CRAIL:  I'm sorry, Your Honor.  To be clear, Ms.

24   Haynes -- Gabriela Haynes had told Mr. Gadson on the phone

25   that the cops found a gun, or that they -- they had said that

they found a gun or words to that effect, and that's when he

responded there was -- basically that there wasn't one, which

was true.  I have no idea why Ms. Haynes said that.

            THE COURT:  Maybe it's because she was confused with

the vest.

            MS. CRAIL:  Or confused with the gun taken from Mr.

Edwards' place.  There's another possibility.

            THE COURT:  That could have been it.

            MR. CRAWFORD:  And she was the one that also

mentioned the money, so I guess our objection to these

different statements by people that didn't testify at trial

was -- it's all hearsay because --

            THE COURT:  It is hearsay.

            MR. CRAWFORD:  -- by confidential informant six,

confidential informant two, any of those should be stricken

from this because they weren't even presented at trial.

            THE COURT:  But it's with -- it's an appropriate --

it's appropriate within a sentencing memo -- I mean,

presentence report of this nature.  None of these things are

surprising because I sat through the whole trial.  I know what

-- I know tons about this case.  I stayed awake during that

entire trial, okay?  Next.

            THE PROBATION OFFICER:  As far as Paragraph 66, Your

Honor, I would have to defer specifically to counsel exactly

what was testified to.  All Paragraph 66 indicates in the

1    presentence report is that:

2         "In September of 2001 [sic], CS-1 was interviewed by

3         ABADE investigators and identified photographs of

4         members of the conspiracy, including Gadson, Haynes,

5         Edwards, Joshua Haynes, and Christopher Howard, and

6         stated each of them had been present during drug

7         deals at the Fouts residence."

8    It was my understanding that the testimony, which comes up

9    later and not in Paragraph 66 -- that what he's referring to

10   in that paragraph is that CS-1 testified that he had been

11   involved in ten to twelve nine-ounce purchases of crack

12   cocaine, and those were with Joshua Haynes, but that both

13   Brandon Hayes, Gadson, and Edwards had been present during a

14   portion of those.

15        And under the relevant conduct for the course of

16   conspiracy under that table, they were held accountable for

17   that because they were present during that -- it was during

18   that same course of conduct, common scheme or plan of the

19   conspiracy to distribute controlled substances.  And so it

20   would have been reasonably foreseeable under the relevant

21   conduct guideline to him that those indeed happened in

22   furtherance of the conspiracy to distribute drugs, Your Honor.

23        THE COURT:  Okay.  So, Mr. Crawford, what was your

24   response?

25        MR. CRAWFORD:  I guess -- I guess our position on

1    that is Joshua Haynes was the one dealing the drugs.  He's not

2    even named in this as part of the conspiracy, at least not

3    indicted.  He was there dealing drugs often in the other room.

4    Mr. Gadson may have been there a few times where he was

5    sitting on the couch -- that was the testimony, that he was

6    there maybe half the time sitting on the couch or in the

7    hallway, not in the same room.  And so, we don't think that

8    the crack cocaine dealing had anything to do with Mr. Gadson.

9              THE COURT:  Okay.  That's more of an argument with

10   the jury's verdict.  Okay.  Next?

11             THE PROBATION OFFICER:  Your Honor, Paragraph 70, he

12   said, "CS-4 did not name Gadson as living at Fouts."  And I

13   would agree in it didn't indicate that he did.

14             THE COURT:  I didn't think that Gadson lived at

15   Fouts.

16             MR. CRAWFORD:  Your Honor, back to that comment that

17   you made --

18             THE COURT:  Go ahead.

19             MR. CRAWFORD:  -- that that's more of an argument

20   for the jury --

21             THE COURT:  It is.

22             MR. CRAWFORD:  But the jury -- it may have been, but

23   the jury didn't decide what drugs were part of the conspiracy

24   necessarily, they just said that Mr. Gadson was convicted of

25   conspiracy.

1          THE COURT:  True.

2          MR. CRAWFORD:  And so, it's for the Court to decide

3    which drugs to include in that because the jury didn't have

4    that decision in front of them.

5          THE COURT:  Okay.

6          MS. CRAIL:  Your Honor, I'll -- I'll note with that

7    though that the jury did have to find specifically which drugs

8    and that they were over the -- or that the cocaine in any

9    event was over the threshold amounts.

10          THE COURT:  Right.  It was in the verdict form.

11          MS. CRAIL:  Right.  So, that was found, and once you

12   get past that, the rest of it is simply relevant conduct for

13   the courts to determine.  And this is relevant conduct.  He

14   was convicted of conspiracy, so other actions of co-

15   conspirators that are reasonably foreseeable to him are

16   attributable to him for purposes of sentencing.

17          THE COURT:  All right.  I understand the position.

18   Okay.  Next?

19          THE PROBATION OFFICER:  Did you want me to repeat

20   what I said as far as seventy, Your Honor?

21          THE COURT:  Well, seventy just says everyone knows

22   that Gadson was not living at the Fouts residence, at least

23   not -- I don't know -- he had another residence he was living

24   at, that was the Gillam residence at the time, isn't that

25   true?

1   MS. CRAIL: Right. More than -- probably more than

2 one, Judge, but in any case, certainly not there.

3   THE COURT: Well, but we know about the Gillam.

4   MS. CRAIL: Right.

5   THE COURT: There's Chena Ridge, too, is that right?

6   MS. CRAIL: And there's also the one in Wasilla, the

7 report heard right.

8   THE COURT: Oh, and then -- that's right, Wasilla,

9 too. All right. Go ahead.

10   THE PROBATION OFFICER: As far as paragraph --

11   THE COURT: Besides it doesn't matter. It doesn't

12 matter.

13   THE PROBATION OFFICER: It's not -- Paragraph 71. I

14 would indicate that in Paragraph 71 of the presentence report,

15 it states that:

16   "In October of 2011, CS-4 was re-interviewed and

17   stated that very recently Gadson had spoken to CS-4

18   and attempted to repeatedly dissuade CS-4 from

19   testifying against Gadson."

20 And so -- and then he's now just stating that he didn't ask

21 him to not speak, it's just basically word against word, Your

22 Honor.

23   THE COURT: Right.

24   THE PROBATION OFFICER: I think mine accurately

25 reflects what (indiscernible - simultaneous speakers).

1      THE COURT:  Well, your -- yours reflects what's said

2   and, you know, I can -- I can take testimony today if the

3   parties want to give sworn testimony.

4      MS. CRAIL:  Well, Judge, in any case, the Court

5   heard Mr. Edwards testify, and my recollection is at this

6   point, I mean it's a few months ago, but that he did testify

7   about being told to stay -- basically not to talk about Mr.

8   Gadson's involvement or words to that effect.  So, that's part

9   of this trial record.

10      THE COURT:  You know, I'm -- I'm -- and we get a

11   little confused when we use these numbers CS-4.  Can we use

12   names?  I mean, they all -- unless there's someone that has a

13   big secret.

14      MS. CRAIL:  Right.  With -- with -- with -- other

15   than the ones that weren't actually named for the record, but

16   right, you've already mentioned Mr. Vokelander and, of course,

17   Mr. Edwards --

18      THE COURT:  Right.

19      MS. CRAIL:  -- testified and we've spoken about Mr.

20   Haynes, so Mr. Edwards is --

21      MR. CRAWFORD:  CS-4 is Brandon Haynes, Your Honor.

22      THE COURT:  Okay.  CS-4 is Brandon Haynes.  Okay.

23      MS. CRAIL:  Right.

24      THE COURT:  Is that your understanding who CS-4 is?

25      MS. CRAIL:  I believe CS-4 is supposed to be Brandon

1  Haynes, that's correct.

2          THE PROBATION OFFICER:  That is correct, Your Honor.

3          THE COURT:  Okay.

4          MS. CRAIL:  And CS -- and -- and I think they listed

5  CS-5 as Mr. Edwards.

6          THE COURT:  So, why did you talk to me about this

7  Ray's (ph) Edwards?

8          MS. CRAIL:  Okay.  Because -- actually because I was

9  confused for a moment.

10         THE COURT:  I thought so.  Some --

11         MS. CRAIL:  I was thinking about Mr. Edwards, yeah.

12         THE COURT:  -- somebody was confused.

13         MS. CRAIL:  Yeah.  No, I apologize for that, Your

14 Honor.  And because I was focused on Mr. Edwards, I didn't

15 double check -- I didn't double check that.

16         THE COURT:  Okay.  Whose -- whose turn is it?

17         THE PROBATION OFFICER:  All right.  Your Honor,

18 Paragraph seventy --

19         THE COURT:  Are you still in the middle of a

20 sentence?

21         MS. CRAIL:  I was just double checking.  I'm not

22 sure -- I was just double checking with Investigator Thompson.

23 I'm not certain that Mr. Haynes ever specifically stated that

24 Mr. Gadson had contacted him -- that he had personally stated

25 that Mr. Gadson had contacted him.

1    THE COURT:  Then how did -- how did -- how did --
2    where does this come from?
3    MS. CRAIL:  I believe it came from Mr. Edwards, that
4    he had been -- that Mr. Gadson had contacted both him and Mr.
5    Haynes.
6    THE COURT:  Well, wait a second.  If -- if we don't
7    have -- know where it came from, we probably ought to strike
8    the part --
9    MS. CRAIL:  All right.  I'm sorry, Your Honor.  I'm
10   just -- I was trying to clarify because --
11   THE COURT:  Okay.  Clear it up.
12   MS. CRAIL:  -- the investigators were --
13                       (Pause)
14   MS. CRAIL:  All right.  I'm sorry, Your Honor.  I
15   was -- I was confused with this.  And if -- if necessary, we
16   -- as you say, we can put on evidence.  Investigator Thompson
17   indicates though that, yes, Mr. Haynes did tell him that Mr.
18   Gadson had asked him to -- to write a letter or --
19   THE COURT:  So, that's where that comes from.
20   MS. CRAIL:  Right.  That's -- that's where that
21   comes from.
22   THE COURT:  That's Haynes talking to the officer.
23   MS. CRAIL:  Correct.  And I was confused, but it is
24   both of them apparently told the officer at one point or the
25   other.

1    THE COURT:  Well, I -- yeah, but they're only

2  talking about in this paragraph about CS-4.

3    MS. CRAIL:  In this paragraph, Mr. Haynes.  Yes,

4  sir.  But he did.

5    THE COURT:  Okay.  All right.  So, that's the basis

6  for that.  Okay.  Next.

7    THE PROBATION OFFICER:  Thank you, Your Honor.  At

8  Paragraph 73, counsel just notes that:

9    "CS-5 indicated" -- and that would be Mr. Edwards as

10   CS-5 -- "that Bucket supplied two kilos of cocaine

11   in the Fouts residence."

12  Again, no reference to Gadson and that is after the

13  (indiscernible) paragraph.

14    THE COURT:  That's true.

15    THE PROBATION OFFICER:  Correct.  As far as

16  Paragraph 74, "CS-5 stated he had seen Gadson with a kilo."

17  And this just kind of reiterates the testimony.

18    THE COURT:  Mm-hmm (affirmative).

19    THE PROBATION OFFICER:  It's my position, Your

20  Honor, that according to the Government, this accurately

21  reflects the testimony that was at trial and Your Honor heard

22  that.

23    THE COURT:  Mm-hmm (affirmative).

24    THE PROBATION OFFICER:  So, he's trying to make a

25  distinction between possibly when he moved into residences,

1    but I think that the presentence report accurately records

2    what was testified to at trial for both seventy-four and

3    seventy-eight.

4          THE COURT:  Okay.

5          THE PROBATION OFFICER:  As far as -- and then he

6    indicates he's going through summaries, and again I've already

7    discussed the same course of conduct, common scheme or plan

8    assessment as to whether or not that crack cocaine applies

9    under the guidelines.  That's page seventeen summary.

10         THE COURT:  Right.

11         THE PROBATION OFFICER:  He is correct as far as page

12   nineteen.  There was -- the table inaccurately reflects

13   certain amounts, and so if we go to the relevant conduct table

14   in the presentence report, Your Honor --

15         THE COURT:  Page nineteen.  Okay.  I've got page

16   nineteen.

17         THE PROBATION OFFICER:  Under Mr. Gadson's residence

18   at Gillam Way --

19         THE COURT:  Right.

20         THE PROBATION OFFICER:  -- it should be point four

21   grams of powder cocaine, not three point three grams of powder

22   cocaine, and there -- and he's correct that there was no crack

23   cocaine found, so the four point six grams would go away.

24         THE COURT:  Okay.  All right.

25         THE PROBATION OFFICER:  Because of the amount of

1    other drugs, Your Honor, it doesn't impact --

2              THE COURT:  Okay.

3              THE PROBATION OFFICER:  -- because there's such

4    small amounts, but for the accuracy of the record, both of --

5    neither of those were found at that residence.

6              THE COURT:  Can you make that change then?

7              THE PROBATION OFFICER:  Yes, Your Honor.

8              THE COURT:  Okay.

9              MS. CRAIL:  And we agree, Your Honor.  The -- the

10   fourth column is actually correct, but the fifth column for

11   some reason, which doesn't match the fourth column, has that

12   variation.

13             THE COURT:  You're right.  Okay.  So, make that

14   change.

15             THE PROBATION OFFICER:  And -- yes, Your Honor.

16   We'll make that before it goes to BOP.

17             THE COURT:  Okay.

18             THE PROBATION OFFICER:  And then as far -- you know,

19   he's arguing then that the Fouts and Cranberry residence where

20   he didn't live, we did not hold him accountable for anything

21   at the Cranberry Ridge residence, but as far as the Fouts

22   residence, that there was certainly testimony that he was

23   present there.  I think most noteworthy was the fact that his

24   fingerprint was found on the box that contained the biggest

25   quantity of powder cocaine.  Mr. Gadson's fingerprint was

1  located on that, and there was enough testimony that he was

2  supplying the drugs, and that he'd been seen at the residence

3  during the drugs deals, but he was held -- under the relevant

4  conduct portion of the guidelines, he would be held

5  responsible for the drugs that were at that Fouts residence as

6  long as -- and the ones at Gillam Way.

7              THE COURT:  Okay.

8              THE PROBATION OFFICER:  And I think that -- so those

9  are kind of his summary ones there.

10             THE COURT:  Okay.  Next?  Where are you now?

11             THE PROBATION OFFICER:  I'm now down -- it talks

12  about CS-5:

13                 "Donte Edwards stated in a recorded call, 'They say

14                 if you act like you're going to tell on someone,

15                 they will let you out on third-party.  I'm going to

16                 do that.'"

17             THE COURT:  So, what is that -- I don't --

18             THE PROBATION OFFICER:  I don't know what relevancy

19  that is, Your Honor.

20             THE COURT:  But that's not referenced in the

21  presentence report, is it?

22             THE PROBATION OFFICER:  It's -- it's not.  And then

23  he talks about how recently after Edwards' sentencing --

24             THE COURT:  Okay.  Those are sentencing arguments.

25             THE PROBATION OFFICER:  Yeah.

1	THE COURT:  Okay.  So, they don't have to be in the

2	presentence report.

3	MS. CRAIL:  No.  Your Honor, just for the record,

4	I'll note that that's an incomplete record of what he said.

5	He indicated that -- he did make a statement to that effect,

6	but then he -- he went on basically to say that he was going

7	to run.  In other words, get out on third-party by claiming

8	that he was going to talk, and then he was going to -- then he

9	was going to run.

10	THE COURT:  Edwards?

11	MS. CRAIL:  Yes.  That -- that was that May phone

12	call which --

13	THE COURT:  Okay.

14	MS. CRAIL:  Right.  So, the circumstances were not

15	saying I'm going to get out and lie about something, it was

16	I'm going to get -- say this so I can get out of jail, and

17	then I can run.

18	THE COURT:  Okay.

19	THE PROBATION OFFICER:  Then, Your Honor, we're at

20	page twenty-two, Paragraph 91.  Counsel argues that there's no

21	evidence that the Gillam house was used to manufacture

22	controlled substances.  I don't think that was ever alleged.

23	To distribute drugs, we would disagree based on the testimony

24	of what individuals had seen there, and it's my understanding

25	that agents had also observed short-term traffic at that

residence, and that was included in the presentence report,

and I would agree that there were no firearms.  There was a

ballistic vest, but no firearm was located at that residence.

He's correct.

          THE COURT:  Okay.

          THE PROBATION OFFICER:  And as far as --

          THE COURT:  Wait.  Government have any response to

that?

          MS. CRAIL:  We --

          THE COURT:  Any clarification?

          MS. CRAIL:  I -- the -- it's basically argument,

Your Honor, because there's nothing in Paragraph 91 that

suggests the opposite.  In other words, it doesn't say it was

used for manufacture.  It does indicate distribution, but that

was consistent with trial testimony.  From the investigators

who observed the short-term traffic as well as from Mr.

Edwards and from the -- the corroboration of what was found in

there.  And nobody said that there was a gun found.  There was

a ballistic vest, which I pointed out to the jury, but -- but

interestingly enough, no gun --

          THE COURT:  Okay.

          MS. CRAIL:  -- in his residence.  But that -- that

-- as I say, that does not -- that's argument than actually an

error or anything with a problem with ninety-one.

          THE COURT:  Okay.

1    THE PROBATION OFFICER:  And then, Your Honor, as far
2  as not including CS-6's information in there because that
3  individual did not testify at trial.  I would refer counsel to
4  1B1.4 and 18 U.S.C. §3661 where no information should be
5  withheld, and it can all be used for the Court's use in
6  determining the sentence.
7    THE COURT:  So -- so, I guess I'm -- what -- there's
8  no reference to a paragraph here.
9    THE PROBATION OFFICER:  There isn't, Your Honor;
10  however, just indicating the interview of CS-6, which for
11  clarity of the record, Your Honor, Paragraph 75 includes
12  CS-6's interview.
13    THE COURT:  Okay.  But that -- I -- I don't have --
14  I can't remember all this.  Did she say anything about Gadson?
15    MS. CRAIL:  Just a couple of things, Your Honor.
16  Mid-paragraph, she had indicated that she had seen Mr. Gadson
17  at the house, Edwards had talked about Gadson being at the
18  house --
19    THE COURT:  Okay.  Let me just see that so I can
20  catch up with everybody.  Page number you're at?
21    MS. CRAIL:  Page fifteen, Paragraph 75,
22  approximately middle of the paragraph.  It starts out saying:
23    "Other people that stayed at the Fouts residence
24    were J, Ant, Matt Haynes, Brandon Haynes, Gabriela
25    Haynes, Q, and Chris."

1          THE COURT:  Okay.

2                    (Pause)

3          THE COURT:  Okay.  All right.  You know, that's a --

4   that's an interview of a co-conspirator.  I think it's

5   appropriate.  Next?

6          THE PROBATION OFFICER:  CS-3.  Counsel indicates

7   that this individual testified that he had never received

8   drugs from Anthony Gadson, and I believe that's accurate.

9          THE COURT:  It is.  My -- my recollection.  Okay.

10         THE PROBATION OFFICER:  Paragraph 94, he is

11  objecting to Mr. Gadson receiving an enhancement for manager

12  or supervisor.  I would refer the Court to Paragraph 74 where

13  there is evidence that he supervised an individual by the name

14  of Transporter, and he was supplying the drugs to Transporter

15  to bring the drugs up to Fairbanks, and he was one of the

16  bigger suppliers of -- in a conspiracy that involved more than

17  -- more than the five participants, Your Honor.  And I think

18  that the enhancement for a supervisory role would be accurate

19  in this case -- or managerial role.

20         THE COURT:  Okay.

21         MS. CRAIL:  And Your Honor, I'll just confirm he all

22  -- also obviously his testimony he was providing directly to

23  Mr. Edwards.  There's also the indication that he was --

24         THE COURT:  He was supplying drugs to who?

25         MS. CRAIL:  Mr. Edwards.

1      THE COURT:  Okay.

2      MS. CRAIL:  And there was indication that he was

3 also providing drugs to Mr. Haynes.  The Court recollects

4 trial testimony from Mr. Edwards that the kilos would show up,

5 and then Mr. Gadson would show up the next day and Mr. Haynes

6 would give him a kilo quantity of money in a bag, and then he

7 would -- then he would leave with the bag.  And that's outside

8 of Mr. Haynes' out-of-court statements to the effect that --

9 which -- which were limited with respect to Mr. Gadson, but

10 the suggestion that he would essentially direct sources back

11 to Mr. Haynes and then would get -- and apparently take some

12 off the top.

13      But as I say, that's -- whether the Court considers

14 that or not at this point, we have evidence via Mr. Edwards'

15 actual trial testimony to support that he was providing to at

16 least the upper -- upper-level members of the conspiracy.

17      THE COURT:  Okay.  Last?

18      THE PROBATION OFFICER:  And finally, as far as the

19 obstruction of justice, Your Honor, you heard all the

20 testimony as far as what, if any, involvement he had in the

21 retaliation of CS-3.  And then in addition, I think that there

22 is evidence that he tried to persuade his brother not to

23 testify against him, and in fact his brother chose not to.

24 So, I would just leave it at that, Your Honor.

25      THE COURT:  Okay.  So, any -- any discussion from

1    the -- well, I'll hear from Mr. Crawford.

2            MR. CRAWFORD:  Our point on that, Your Honor -- and

3    I don't have much else to say but other than what we said last

4    week and what was in my memo on that point that Ms. Lundgren

5    made about the talking in the jail and pressuring.  Mr. Haynes

6    was subpoenaed to be here, we wanted him to testify.  It

7    wasn't as if Mr. Gadson told him not to testify, he wanted him

8    to come, and he wanted him to tell the truth, and that's -- I

9    mean, that was the evidence.  We -- we had subpoenaed him and

10   he chose not to testify.

11           THE COURT:  The evidence was that you subpoenaed

12   him --

13           MR. CRAWFORD:  Yes.

14           THE COURT:  -- and that he chose not to testify.

15           MR. CRAWFORD:  Right.

16           THE COURT:  (Indiscernible - simultaneous

17   speakers) --

18           MR. CRAWFORD:  There was a desire by Mr. Gadson --

19           THE COURT:  I don't know about to tell the truth

20   part.  No evidence of that.

21           MR. CRAWFORD:  Well, yeah.  It's -- it's a he said,

22   she said type of thing, so --

23           THE COURT:  Okay.

24           MR. CRAWFORD:  That's his -- that's his statement

25   here.

1    THE COURT:  Okay.  All right.  Well, I think we've

2  made a few changes to the presentence report, but generally

3  speaking, nothing that would impact significantly the

4  sentencing.  A number of these items are argument which we'll

5  hear in a moment.

6        The Court previously accepted the presentence

7  report.  The Court will again accept the presentence report

8  with the changes that we've addressed on the record.  I think

9  that the factual statements contained therein have been

10  established, much of which was at trial, by a preponderance of

11  the reasonably reliable information.

12        So, what we have then is interesting.  We have a

13  total offense level of forty-three, criminal history category

14  of three, guidelines say that should be life in prison.  If we

15  were to reduce it by two, just discussion-wise, it would be --

16  because of either the Gillam house issue or because of the

17  obstruction of justice issue, it would still be three-sixty to

18  life.  So, we're talking about either way some big -- big time

19  -- a big-time sentence.

20        The -- but I'm going to accept -- I will accept for

21  purposes of discussion the total offense level is forty-three,

22  criminal history category three, which gives us a guideline

23  range, again -- guidelines tell us that someone with that --

24  in that situation should spend the rest of his life in jail.

25  That's what the guidelines say.

1    Probation officer, however, has suggested leniency

2  and suggested a sentence of twenty years in jail.  That's

3  comprised of a hundred and eighty months for the drug charges

4  plus the sixty for the gun.  And the Government has suggested

5  thirty-five years in jail and got there through a different

6  way, and the defendant has suggested fifteen years in jail.

7  So, that's where I am.  Pretty big range.  We'll hear first --

8  any witnesses today from the Government?

9    MS. CRAIL:  No, I don't believe so, Your Honor.  The

10  only thing would have been those -- those issues we talked

11  about earlier.

12    THE COURT:  Which you've made an offer of proof of

13  and we're not necessary --

14    MS. CRAIL:  And you're comfortable.  So, I don't

15  need witnesses.  Thank you, Your Honor.

16    THE COURT:  Okay.  Mr. Crawford, any witnesses

17  today?

18    MR. CRAWFORD:  No, Your Honor.

19    THE COURT:  Okay.

20    MR. CRAWFORD:  Mr. Gadson wants to --

21    THE COURT:  He'll get to allocute -- give his

22  allocution, but he can also be a witness and do sworn

23  testimony or he can just give his allocution at the end, and

24  usually --

25    MR. CRAWFORD:  Allocution is fine, Your Honor.

1    THE COURT:  Okay.  All right.  So, you've already
2    done it once.  Do you have anything else to say?
3              MS. CRAIL:  I would just reiterate, Your Honor --
4              THE COURT:  But the -- excuse me, but now you've had
5    the defendant's sentencing memorandum --
6              MS. CRAIL:  Yes.
7              THE COURT:  -- and -- and so I think you need to
8    respond a little bit to that.
9              **GOVERNMENT'S SENTENCING RECOMMENDATIONS**
10             MS. CRAIL:  Right.  And I -- thank you, Your Honor.
11   My position remains the same.  I believe that the -- the Court
12   should impose a sentence of thirty-five years total sentence;
13   thirty on the drug count and the additional five on the -- on
14   the gun count.  The --
15             THE COURT:  So, that's less than the guideline
16   range.
17             MS. CRAIL:  It is less than the guideline amount,
18   Your Honor.  And I think what we're doing here is we're
19   basically saying, in an abundance of caution, to suggest that
20   -- if anyone were to suggest that the -- one of those offense
21   -- one of those levels that raised him to a level forty-three
22   somehow or other should not apply, then he would be in that
23   three-sixty to life range.  So, it's basic -- all it would
24   take would be one variation -- one-level variation to put him
25   back into that -- into that range.

1    So, as I say, guidelines are discretionary anyway,

2  but keeping in mind that they're important, but giving him the

3  benefit of -- of the doubt on that issue, we'll call it

4  supposing it were the three-sixty to life range, so let's make

5  it the three-sixty plus the five for the other.

6    Him being thirty-seven years old, the effect may not

7  be a lot different depending on how healthy -- how healthy he

8  is or he remains, but I think it -- it is a reasonable

9  sentence under the circumstances.  Certainly, the Court may

10  find that that is insufficient and that is -- but that's

11  within the Court's discretion.

12    I would, however, strongly recommend that the Court

13  not go below that.  For one thing, as I say, that already

14  gives him the benefit of the doubt with respect to any

15  variations in the -- in the offense level or the enhancements.

16  It keeps in mind that he is responsible one way or the other

17  for an incredible amount of drugs coming into the Fairbanks

18  community, and affecting -- this Court knows how the -- how

19  the drugs affect a community, how it has affected his family

20  to include his brother -- his other brothers as well, as I

21  noted in my argument -- original argument, leading -- leading

22  them or certainly not -- not stopping them being led into the

23  -- into the drug milieu.

24    Obviously, their father was there first, true, but

25  their father is out of the way, Mr. Gadson is taking the place

1    of the father, and all he's pretty much done is spent his

2    entire adult doing nothing else.  He certainly hasn't been

3    employed legitimately.  The Court knows that from trial

4    testimony and from the presentence report.

5              A note just to remind the Court.  He's saying that

6    this -- and if we needed it, again, we could put on testimony

7    if the Court requested, but his -- his significant other

8    there, Eva Burke, is supposed to be an engineer.  Apparently,

9    she's making somewhere in the vicinity of sixty-five thousand

10   dollars a year according to something said during the jail

11   phone calls, but they've got a house in Wasilla which she's

12   supposedly paying on.  Why would you pay yet another -- if

13   he's just a nice, normal, stay-at-home dad and not a drug

14   dealer, why would you be paying yet another rent on at least

15   one place in Fairbanks at the same time that you're also

16   paying on a house in anchor -- or in Wasilla, and why would he

17   need to be in Fairbanks staying here instead of -- instead of

18   there if he doesn't have any other employment or anything

19   else, I mean other than his drug-dealing activities?

20             So, that keeps in mind that the money gained from

21   the drug dealing -- we can see where it's going.  I mean, it

22   goes to things like extra -- extra houses.  If you take it

23   that he was staying -- that he was renting the Gillam Way

24   residence during the -- during the time that he also had the

25   residence up on Chena Ridge that Mr. Edwards saw the -- the

other kilo -- the other kilogram or kilograms of cocaine at,
then you've got yet three -- three houses that are involved.

He's simply -- he simply is -- is deeply involved
and unwilling to take responsibility for his actions.  And I
think ultimately, that's what the guidelines are telling us is
that a person in his circumstances -- and keeping in mind the
-- the unwillingness to take responsibility for his actions
and a lack of remorse and otherwise, that his rehabilitative
potential is slim to none, and he needs -- the community needs
to be protected from Mr. Gadson.  He's avoided being convicted
for the most part in the past with that one exception, but
it's -- it's time -- it's time for him to take responsibility.

I will rely on the rest of my sentencing argument
that I made last time and that I put in -- in writing as well,
but I would just ask the Court to recollect that when a person
-- and he certainly -- he certainly already aged out if he's
going to.  At thirty-seven years old, he's not a young
defendant still trying to figure out where he's at.  He's been
spending the last twenty -- pretty much twenty years since he
became an adult not choosing to get a job, not choosing to
study and -- and improve his educational skills, not learn a
trade, not do any of those things.  Instead, he's dealt drugs
and hung around the house.

If he were like his brothers in their -- young and
in their twenties, their early twenties, and saying -- being

1  led into it, then you'd think, okay, maybe he has some

2  chances, but this is a long time for him to have -- to have

3  had.  If he was going to age out, he would.

4          And I do note -- obviously, Ms. -- Ms. Lundgren is

5  not the -- the presentence report writer, but it did disturb

6  me a lot that the presentence report write indicated that,

7  well, there's a hope that he could age out and, therefore,

8  twenty years is enough without any support from the facts of

9  the case or any support from any other source to say that

10  there's any likelihood of him aging out.

11          And I think I noted last time that there are many,

12  many defendants, especially after they get to his age, who

13  don't age out of the system; they like that lifestyle and

14  that's what they do.  Mr. Stephenson (ph), as I mentioned last

15  time, was a particularly apposite example well into his

16  sixties and still -- still dealing -- continuing to deal drugs

17  in the Fairbanks area.

18          So, keeping that in mind, the recommendation, I

19  believe, of thirty-five years is appropriate, but I certainly

20  would ask the Court not to go below that.  Thank you, sir.

21          THE COURT:  Okay.  Mr. Crawford.

22          **DEFENDANT'S SENTENCING RECOMMENDATIONS**

23          MR. CRAWFORD:  Thank you, Your Honor.  You know,

24  like I said, most of this I've already stated in my

25  memorandum.  Just to address one of the questions that Ms.

1  Crail asked in her -- in her argument now, why would Mr.

2  Gadson need to be in Fairbanks?  And I asked the same

3  question, why would he need to be in Fairbanks?  He could just

4  send Transporter according to Ms. Crail.  He was the kingpin

5  according to Ms. Crail.  She -- she says that he was involved

6  in all this; that coordinated it all.  Why would he even need

7  to be here nearby if he was such a -- a big drug dealer?

8       The evidence shows that at his home, there was

9  marijuana.  There was no gun found there.  Obviously, the jury

10 found that he was part of a conspiracy to deal drugs.  We

11 can't necessarily pick their brain as to what they were

12 thinking at the time.  They saw the evidence that was before

13 them.  Some of the evidence we were unable to -- to submit to

14 the Court.  We had mentioned that before with Mr. Haynes.

15      The fact is Mr. Gadson had a falling out with his --

16 with his girlfriend, the mother of his children.  He was on

17 probation at the time.  He was not to have contact with her,

18 and so being in Anchorage was not really a solution.  His

19 friends lived here in Fairbanks.  This is where he came from

20 before he moved to -- to Anchorage.  He came back here.  He

21 was watching his son and other children often and because of

22 that, Eva Burke is the one that helped to provide for them and

23 provide a place for them to live and to stay.  She loaned him

24 her vehicle so that he'd have a way to go back and forth to

25 Anchorage to -- to take the kids back and forth.

1        If we look at the guidelines -- and this is one of

2    our arguments that the crack cocaine should not apply because

3    that really increased the sen -- increases the sentence.  If

4    we looked more at the marijuana, obviously, it would be a low

5    level; if we added the cocaine, the powder cocaine, it would

6    be much higher.  But even a level thirty-two is what we were

7    looking at, less than fifteen kilograms of cocaine, he would

8    be looking at between a hundred and fifty-one and a hundred

9    and eighty-eight months.

10        We believe that -- my argument anyway, is that he

11    should serve fifteen years, which would be a hundred and

12    eighty months because of the mandatory minimums.

13        THE COURT:  All right.  Thank you.  What do you have

14    to say, Mr. Gadson?

15        THE DEFENDANT:  Of the case, sir?

16        THE COURT:  You -- you -- this is your time.  You

17    can talk about whatever you want to talk about.

18               **DEFENDANT'S ALLOCUTION**

19        THE DEFENDANT:  I got a few questions about what

20    went on.

21        THE COURT:  Got to keep that microphone right up

22    close here though if you could.

23        THE DEFENDANT:  I said I got a few things I want to

24    talk about what went in the case myself that I just didn't

25    understand.  Like, it says Mr. Haynes stated after the raid on

1  Adams Drive that both kilos were his at Fouts.  So, how was I

2  responsible for the kilos that was found in the box?  Nobody

3  said I put them -- put it there and nobody said it was mine or

4  I had it delivered.  At trial, when it was -- was asked who

5  supplied drugs to the house, why wasn't my name said?  He

6  never said I supplied any drugs to the house.  He named off

7  five or six other people.  And so why was Edwards able to make

8  impeachment statements and who's to say which statements was

9  the true one?  If they found -- if -- they found weed at my

10 house, but where were all the drugs that he talked about?

11       Then Ms. Crail said I supplied most of the drugs in

12 the conspiracy.  How?  What did I have to do with the ninety

13 ounces of crack that was supposedly sold?  No one said I

14 supplied them, no one said I sold them -- sold them crack, no

15 one said I had anything to do with the drugs that were found

16 at Fouts.  Nobody never said they seen me with any drugs at

17 Fouts.  Nobody said I was responsible for the drugs that were

18 found at Adams or Cranberry.

19       And these four extra kilos that Mr. Edwards said he

20 saw, who was I supplying the kilos to?  I didn't hear any --

21 any mention that who -- who in the conspiracy received these

22 drugs.  As a matter of fact, Mr. Edwards never mentioned

23 anybody in the conspiracy that could get drugs from me but

24 him.  And he said I gave Mr. Wilson some, but remember, nobody

25 else was ever around when Mr. Edwards got his drugs or seen

these drugs, so how could I -- so how could he say that I was giving Mr. Wilson drugs?  He never explained why he said that.

Then it goes on to like in the PSR, it says CI number one said I was present in the same room when -- when a gun was pulled out, when the gun is showed to him, which he did not.  He said I was sitting on the couch and when I got up and went down the hallway, that's when he was showed a gun.

Then we have the made-up stories like Mr. Gadson is Pablo Escobar, Mr. Gadson is Tony Montana.  Those were kingpins, not me.  If I was a kingpin, where is my kingpin attorney, where's my kingpin houses, where are all the kingpin money and drugs, all my businesses?  Mr. Edwards said he seen Brandon give me money twice, but never seen any drugs.  He never mentioned nobody else at the house getting any drugs from me.  Who did the man that sold the ninety ounces of crack get his crack from?

It's obvious -- it's obvious Mr. Edwards was in the same position to know this.  He was the main (indiscernible). Just like when he spoke about this transporter.  He seen money being given to me twice.  He never said he seen any drugs, and he lived at Fouts.  So, how he see any drugs, especially when you he tell them that he got all his drugs from Brandon at that time.

Mr. Edwards was -- was around Adams Drive also.  He said he got all his drugs from Brandon then, too, but who was

-- who was supplying those drugs during that time?  He never

said I was.  Mr. Edwards said he -- he started to get his

drugs from me because nobody he knew had enough drugs, but

this is a man buying three to four ounces.  That isn't a lot

of drugs for a man that knows so many drug dealers.

When he was asked in trial who supplied the house on

Fouts with drugs, he named at least five to six people, none

who were me, and then -- and in Mr. Edwards' text messages

that the Government had against him, he was talking about

drugs and transactions.  That had nothing to do with me

either.  And was there a phone taken from Mr. Edwards at his

arrest?  Did you all find me with text messages from him to

me?  Both of my phones were taken.  I never seen any evidence

of me texting him about any drugs.

Then it goes on.  Mr. Edwards stated that he seen

Brandon give me forty thousand dollars at Fouts on two

occasions, which Brandon denied that it ever happened.  At

Donte's debriefing, he says forty to fifty thousand, but at

trial he said forty thousand.  He said it was in a white trash

bag, he said he knew it was forty thousand because he knows

what forty thousand looks like because he seen forty thousand

plenty of times.  But isn't it true that forty thousand in

ones or fives or tens or hundreds would vary in appearance?

So, how can he be so sure without count -- actually counting?

In Donte's debrief paper says the second time he saw

Brandon give me money, it was in a Nike duffle bag. So, how can you see through a duffle bag to know what's inside of it? And if -- and if there was forty thousand, why did Mr. Edwards' first statements say forty to fifty thousand?

Then Mr. Edwards goes on to talk about a transporter who would transport dope from Anchorage to Fairbanks for the house, but at trial it was stated that the transporter would come, but he never seen any drugs. In Edwards' debrief paper, he said I would show up a day after the transporter, but at trial he said I grabbed the money, and a day or two later the transporter would show up.

Then it goes on. So, Mr. Edwards says he seen three to four kilos in April, a few days before April the 20th. Mr. Edwards bought two ounces of coke on the 18th of April. Police came to -- to arrest me on May the 3rd. Mr. Edwards said he was getting O-Z's from me a lot, but yet during the raid, there were no baggies, there were no cocaine residue, no kilo wrappers, no scales, no residue, no kitchen utensils with residue, no debt tabs written down, nothing to indicate selling cocaine. Seems like there should have been a large amount of cocaine somewhere or at least a couple of hundred thousand. I didn't know the police was coming, so where was all this cocaine and money at?

You all found that there was an amount of cocaine at Adams, you all found a gun and crack at Cranberry Ridge, but

for all those kilos that Mr. Edwards said he saw me with, only two weeks before my arrest, where was the evidence? And even the police said they seen lots of drug trafficking, took over a thousand-some photos, and even had some video, but never captured any of the coming and going of this so-called drug traffic.

Everything Mr. Edwards said he saw or did, there was nobody else around at the time to verify his word. Nobody seen the kilos with him at Gillam, nobody was around when he met -- when he was so-called -- made all his so-called transactions.

He said somebody was there when I made the statement about the transporter getting pulled over, but he don't remember. He said at trial I texted him talking about drugs, but he lost the phone. He said I gave him and Brandon a letter to notarize and sign saying I didn't have nothing to do with this, but he don't know what he -- what he did with it. Nobody -- nobody seen the forty thousand; he was the only one there. Nobody was with him to see the kilo at Chena Ridge or to even say I lived at Chena Ridge.

This is a man that lies when he's in trouble. Here's a couple of sentences from some of his phone calls: I think Tasha's telling on me. I'm going to just write the judge a letter telling him I didn't have anything to do with it. I may have to start talking and tell them that this has

1  nothing to do with me.

2        THE COURT:  Who are you quoting now?  Who -- who are

3  you quoting?

4        THE DEFENDANT:  Mr. Edwards.

5        THE COURT:  Edwards.  Okay.

6        THE DEFENDANT:  Yeah.  They said -- they say if you

7  act like you're going to tell on somebody, they will let you

8  out.  Even in the Donnie Pitka (ph) incidents, Mr. Edwards

9  said I swung on the dude because he said something about my

10 sister.  Mr. Edwards doesn't even have a sister.  And during

11 trial, Donte said when he left Fouts the morning before the

12 bus, there was a kilo on the kitchen counter.  Though when the

13 police raided the house, both kilos were in shoe boxes found

14 in the living room.

15       And the money at my house, my brother told you

16 already, was his, but nobody didn't want to believe it.  But

17 why would I leave thirty-one hundred in my house and leave

18 thirty-eight thousand in the garage, not even hidden that good

19 in a garage that doesn't lock that anybody could go in there

20 at any time?  And I had a safe in my house that I could have

21 easily stored the money in if it was mine.  Why not just keep

22 it in my house?  I think my apartment would have been a safer

23 place than the garage where you can -- where you can even keep

24 a eye on your stuff, and it was a shared garage at that.

25       Then it goes, he spoke about the transporter, but he

1    never seen this transporter with any drugs.  If he never seen

2    this so-called transporter with any drugs, how can he say that

3    this transporter was bringing drugs?

4            Then I want to talk about the -- the grand jury a

5    little bit.  How a officer went to the grand jury under oath

6    and said that I was specifically identified as selling CI

7    number one drugs, and then CI number one comes to trial and

8    says he never bought anything from me.  If that was the case,

9    why would you tell the grand jury that?  When somebody lies on

10   the line, won't you have to make sure that that's who they're

11   talking about?  Why wasn't he showed a photo line-up to verify

12   the people to whom he was speaking about?  Why did you wait to

13   September the 19th to show him a photo line-up?

14           He also told the grand jury that people that CSI one

15   did not know would sit around and hold guns during the drug

16   deals.  But once again, at trial, the CI number one denied

17   that it ever happened.  He said he only seen a gun one time

18   that somebody showed him that was under the cushion on a

19   couch.

20           And then he told the grand jury that there were at

21   least four people who CI number one used to purchase nine

22   ounces of crack at a time from -- on thirteen different

23   occasions, but at trial the CI said there was only one guy

24   that he purchased all the crack from every time.  What I don't

25   understand was why was the grand jury told these things if

1    they weren't verified with CI number one, or true?  How can

2    you indict someone off a false statements, and why didn't CI

3    number one speak for hisself at the grand jury?

4         Then it says, CI number one testified that he was

5    present ten to twelve time -- instances in which nine ounces

6    of crack cocaine had been purchased, but in the summary that

7    took place on September the 19th, 2011, he said he was only

8    present five to six times.

9         So, those -- those are just a few things that I was

10   just wondering about that, you know, never got answered or

11   nobody never even said anything about.

12        THE COURT:  Okay.  Anything else?

13        THE DEFENDANT:  And I -- and I just want to let you

14   know I know how you feel about drug cases and dealers.  Let's

15   just say that -- that you really frown upon it.  I know you

16   care about the community and what goes on in it.  But although

17   you're firm on your beliefs, I hope you can also be fair in

18   your sentencing.

19        I'm not going to sit here and blow smoke up your

20   rear.  I would have never wasted the Court's time or money or

21   better yet, risk the chance of my kids growing up without

22   their father if I didn't believe I was truly innocent of these

23   charges.  I'm a man of reason.  Even though I walked down the

24   wrong path in life on many occasions, I also -- I always face

25   my punishment.  I never tried to fight.  I always admitted and

1   accepted my own problems.  That's a part of being a man.  But

2   another part of being a man is knowing when to fight for your

3   life.

4          I was offered fifty-four months at one point in

5   time.  If I thought I was guilty, there's no way I would have

6   passed that up.  But looking at how things went for me at

7   trial, I wish I would have taken the fifty-four months because

8   now I lost my family and life, and I'm being punished for the

9   wrongdoing of others.  I would have never risked my life or my

10  kids' lives, innocent or not, if I would have known that they

11  didn't need any evidence to convict; that they can convict you

12  off of just word of mouth, hearsay.

13         I just wish someone would have told me that and I

14  wish someone would have told me the extreme of -- of what

15  would happen if I lost trial because there's things that are

16  happening right now that -- that -- that knew -- that I knew

17  nothing about nor was I informed of.  They could have at least

18  let me know that there's no way to -- to win.

19         Have I sold drugs before?  I'm not going to lie.

20  Yes, I have.  Have I ever been arrested for drug possession

21  before?  Yes, I have, in 1997, and I admitted to what I did

22  and took my punishment just like any other time I've been in

23  trouble.  Do I know the people involved in this case?  Yes, I

24  do.  Did I party or hang out with these people?  Sometimes,

25  yes, I did.  But did I agree to sell drugs with these people?

No. Did I supply these drugs to these people? No. Am I a kingpin? No, I am not. Did any of the drugs or money or guns that were found at Fouts belong to me? No. Did anybody say that they did -- did anybody say that they did? No. The only thing I'm guilty of is smoking marijuana, gambling, partying with the wrong crowd on occasion. But to me, these people were still friends and family.

I can't blame others for what they do or chose to do in life as long as I gave the effort to change my ways for my family. When I had my first kid, me and my fiance decided since she had a good career, that I would stay at home and take care of the kid. I had a little money saved and I had cars to sell. I know as long as you keep a car to sell, that's money when you need it, so I stopped selling. To me, my kids were -- were more important than what I was doing. I even got away from the environment.

I moved to Anchorage to be a stay-at-home dad. I didn't have money -- I didn't have many friends in Anchorage, so some weekends I would come to Fairbanks to hang out. And even though nobody believes me, I did change because I realized I had something that I never had back then when I was dealing, they're called my kids, and to me they were worth it.

That's why I wish somebody would have warned me or let me know the consequences of losing trial. I didn't know my offense level would be a forty-three, I didn't know I would

1   be looking at twenty to life, I didn't know that they could

2   convict you off a thumb print on a shoe box at a house where

3   you didn't even live after a man already admitted to what was

4   in the shoe box being his.  I guess I was expecting too much

5   to have a fair trial based upon evidence and stuff that I

6   actually did.  It's like I lost my life off of what others

7   were doing and made up stories.

8           Now, I'm facing more time and I have more drugs

9   pinned on me than anybody else involved in this case, but I

10  guess that's how it's supposed to go; the real people involved

11  get less time or no time and somebody that had nothing to do

12  with this situation gets the most time for a few lies and

13  assumptions.  That's what this whole case was about.  I think

14  somebody's life should -- should have been worth more than

15  that, but I guess it's too late now.

16          Everything's said and done now, so nobody cares

17  about what I just said because in their eyes, I was already

18  guilty before the case even started.  So, all I can pray and

19  ask for now is please be fair and please give me the

20  opportunity to be able to see my family and kids again.  Thank

21  you.

22                      **COURT'S COMMENTS**

23          THE COURT:  All right.  Thank you, sir.  You know,

24  when you were arraigned in this matter, you were told what the

25  maximum sentence was, and then you were arraigned again when

you had the superseding indictment, and you were told what the maximum potential sentence was.  I'm sure you were listening.  That's an important part of the arraignment process.

I didn't determine that you were guilty in this matter, a jury determined that after listening to the evidence.  You were found guilty of counts one, two, and three, again, of the First Superseding Indictment; that the evidence supported the jury verdict.

Now, I hear Mr. Crawford mention at our last hearing for the first time something about concern about an all-white jury.  That argument is, of course, without merit.  You were convicted by a jury that believed you were guilty.  The primary witnesses against you were black.  The confidential informant that first broke this case was an Alaska Native, and we can't forget the fact that Mr. Taylor, who was found not guilty by this very same jury, was black as well.  So, race is not a factor in this in any way.

Second, Mr. Crawford has suggested that his experience in criminal court is -- is -- might have been a factor.  Of course that's irrelevant.  It's improper to raise that before the jury and it's just not a relevant argument, but he clearly was competent in -- at the trial.  And frankly, based on the evidence presented, any -- there's no attorney that could have obtained an acquittal once the jury decided they were going to believe Edwards and Vokelander.  The

evidence was -- you know, the jury was well justified in reaching the verdict they did. They simply believed the Government's witnesses. They were cross-examined, they listened to the witnesses, and they concluded that the witnesses -- although they were not the best witnesses in the world, they're druggies themselves -- but they believed them under these facts and in this case. That's what the jury did. That's their job.

And this jury listened intently and they -- they didn't buy all the Government's arguments. That's why Mr. Taylor is -- is walking free, they just didn't buy that. That's why Mr. Wilson was not convicted of attempted murder. They didn't believe -- they didn't believe the Government had proven those -- those -- those charges. But they believed the Government had proven the charges against you, and they believed that beyond a reasonable doubt, and that's just where we are today.

The suggestion that Mr. Haynes would have vindicated you had he come in to testify but that instead he decided not to testify because he wanted to take the -- the Fifth -- the Fifth Amendment, is without merit. Haynes had a plea agreement. He was free to come in here and testify if he wanted to without any concerns about an increased sentence unless, of course, he lied. And to come in here and say that those were his drugs or his money and not yours would have

1    likely been a lie, he would have been convicted of perjury,

2    and the plea agreement would have been out the window.  So,

3    that's why I think he took the Fifth Amendment, not because --

4    purely because he -- as much as he loves you and as much as he

5    didn't want to hurt you, he wasn't willing to go to jail any

6    longer; he wasn't willing to lie on your behalf.

7            The truth is that you were a large-scale drug dealer

8    in Fairbanks.  I don't know of the phrase kingpin applies or

9    not, but you certainly were the leader of this operation.  You

10   didn't do the street-level -- level dealing, but you were a

11   large-scale distributor.  That's just the truth.  You can say

12   what you want to say, you can convince yourself and convince

13   your friends, you can do what you want, but the jury is the

14   one that decides truth, the jury is the one that decides guilt

15   or innocence, and the jury spoke clearly.

16           And I admired that jury because I watched them, they

17   listened to every single detail.  They deliberated at length

18   to make sure they did the right thing, and I'm convinced,

19   based on the totality of the evidence, that the jury verdict

20   was fair and reasonable.

21           So, you earned a life sentence; that's what you

22   earned.  That's what your choices in life have -- have led

23   you.  But that's a long time, and even the Government

24   recognizes that that's -- that's a little extreme.

25           Now, I'm looking at this whole situation and I'm

1  going to make a few little adjustments.  I'm going to give an

2  offense level of forty-one because I'm not absolutely

3  convinced that we can call the Gillam residence a distributing

4  center.  That seemed to be the Fouts residence and others.

5  So, I'm going to give you a break there and call this an

6  offense level forty-one.  You still have a criminal history

7  category three.  That gives us a sentencing range of three

8  hundred and sixty months to life.  That's what the -- that's

9  what the sentencing range would be.

10         THE PROBATION OFFICER:  Your Honor, I'm sorry, but

11 for an offense -- for forty-one, it would be three hundred and

12 twenty-four to four hundred and five months.

13         THE COURT:  Okay.  Three twenty-four --

14         THE PROBATION OFFICER:  Oh, no, I'm sorry, you're

15 right, three-sixty to life with the three.  I apologize,

16 you're right.

17         THE COURT:  Okay.  You see?  I'm right.  Remember

18 that.  Three-sixty to life.

19         THE PROBATION OFFICER:  Yeah, you're right.

20         THE COURT:  Okay.  That's what the range is.  So,

21 we've got offense level forty-one, criminal history category

22 three, sentence range three hundred and sixty months to life

23 imprisonment.  That's what the guidelines say.  And we've got

24 the problem with the gun, that's a five-level -- that's a

25 five-year enhancement.  But I'm looking at the whole

1  situation.

2        You know, you're right.  We're tired of drug dealers

3  because they hurt families, they hurt communities, and they

4  threaten every person around.  They threaten their children,

5  they -- they threaten -- they're just a threat to the

6  community.  But that's no secret.  I mean, like I've -- I've

7  said earlier, if the community had a choice, they would

8  probably run every drug dealer they could out of town forever

9  because they know how much damage they do.

10        But we also are concerned that we treat everyone

11  fairly and according to the law, and we want to deter -- we

12  want people, young people, when they're thinking about what

13  are we going to do with our life, are we going to school or

14  are we going to sell drugs?  They want to make sure that the

15  sentence that I impose today deters other people trying to

16  figure out what to do with their life from becoming a drug

17  dealer.

18        So, deterrence of yourself, of course, and others is

19  important.  We need to reaffirm societal norms, make it clear

20  by the sentence we impose today that this society, this

21  community is sick and tired of drug dealers and all the pain

22  that -- that -- that follows.  So, that's a big -- a big part

23  of it.  And we want to encourage respect for the law.  You had

24  none, you've demonstrated none through much of your adult

25  life, but that has to be part of it as well.  But, you know,

1  we're not without compassion.  We have to look at

2  rehabilitation and look at the big picture.

3         I think when I look at this situation that thirty-

4  five years in jail is -- is excessive given the fact that

5  there's no violence involved, you -- I don't have any evidence

6  other than your wife that you've ever injured anyone, and so

7  I'm not inclined to go -- go that far, although I can

8  understand how the Government gets there.  So, I am going to

9  -- I'm even going to go down, very downward from the guideline

10  range.

11         I -- I -- I get there by noting the absence of

12  violence, by noting the hope for rehabilitation, and I -- when

13  I look at all these things, I conclude that a twenty-five-year

14  sentence is probably appropriate under the circumstances.  It

15  will remove you from society for long enough for -- for us

16  maybe to keep -- catch our breath for those who -- over whom

17  you have influenced to be on their way in -- in their own

18  lives, and for you maybe to think about changing your course

19  of -- of -- of the direction of your life once you're

20  released.  That's where I get there.  I've looked at the 3553

21  factors and I think that twenty-five years is an appropriate

22  sentence.

23         So, I want to make it official.  And the way I -- I

24  get there, by the way, is -- is -- that's three hundred

25  months, so it's -- it's -- it would be a total of two hundred

1    and forty months on counts one and two to run concurrently,

2    and sixty months on count three to run consecutively.  Is that

3    -- the probation officer with me?

4                THE PROBATION OFFICER:  Yes, Your Honor.

5                THE COURT:  Does that make sense so far?

6                THE PROBATION OFFICER:  Yes, Your Honor.

7                        **IMPOSITION OF SENTENCE**

8                THE COURT:  Okay.  Pursuant to the Sentencing Reform

9    Act of 1984 and considering the factors found in 18 U.S.C.

10   §3553(a), it is the judgment of the Court that the defendant,

11   Anthony Roderick Gadson, is hereby committed to the custody of

12   the Bureau of Prisons to be imprisoned for a term of three

13   hundred months, consisting of two hundred and forty months on

14   counts one and two to run concurrently, and sixty months on

15   count three to run consecutively to the sentence imposed on

16   counts one and two.

17               Upon release from imprisonment, the defendant shall

18   be placed on supervised release for a term of eight years,

19   consisting of eight years on counts one and two and five years

20   on count three, all counts to run concurrently.  Within

21   seventy-two hours of release from custody of the Bureau of

22   Prisons, the defendant shall report in person to the probation

23   office in the district to which the defendant is released.

24               While on supervised release, the defendant shall not

25   commit another federal, state or local crime, shall not

possess a firearm or illegal controlled substance, and shall

submit to DNA collection and shall comply with the standard

conditions that are included in the judgment issued by the

Court.

Additionally, as the offense occurred after the

effective date of the Violent Crime Control and Law

Enforcement Act of September 13, '94, and the Court finds

there is a risk of future substance abuse, the defendant shall

refrain from the unlawful use of controlled substances and

shall submit to one drug test within fifteen days of release

on supervision, and at least two periodic drug tests

thereafter, not to exceed twelve tests per month, as directed

by the probation officer.

The defendant shall also comply with the following

special conditions:

In addition to submitting to drug testing in

accordance with the Violent Crime Control and Law Enforcement

Act of '94, the defendant shall participate in an outpatient

treatment program approved by the United States Probation

Office for substance abuse treatment, which program shall

include testing to determine whether the defendant has

reverted to the use of drugs or alcohol. At the direction of

the probation officer, the defendant may be required to pay

for all or a portion of any treatment program.

The defendant shall submit to a warrantless search

1  of his person, residence, vehicle, personal effects, place of

2  employment and other property by a Federal Probation or

3  Pretrial Services Officer or other law enforcement officer

4  based upon reasonable suspicion of contraband or a violation

5  of a condition of supervised release.  Failure to submit to a

6  search may be grounds for revocation of supervised release.

7         The defendant shall provide the probation officer

8  access to requested financial information, including

9  authorization to conduct credit checks, and shall not incur

10 any new debts or apply for credit without prior approval of

11 the probation officer.

12        The defendant shall not possess a destructive device

13 or other weapon.

14        The defendant shall participate in a vocational,

15 educational, or cognitive skill program as directed by the

16 probation officer, which program may include job readiness

17 training, skills development training, and cognitive skills

18 development training.  At the direction of the probation

19 officer, the defendant may be required to pay for all or a

20 portion of any such program.

21        The Court finds that defendant does not have the

22 ability to pay a fine or community restitution.  It is further

23 ordered that the defendant shall pay to the United States a

24 special assessment of three hundred dollars which shall be

25 paid immediately to the Clerk of Court.

1    Another factor that I didn't mention is your lack of
2    remorse.  You're trying to pretend like you're innocent when
3    we all know you're guilty.  But anyhow, that's -- that's --
4    that's you.
5         Now, in this particular case, you do have a right to
6    appeal, so let me read you your appeal rights.
7         You're advised that you have a right to appeal your
8    conviction and a right to appeal your sentence.  The sentence
9    may be appealed on any of the grounds mentioned in 18 U.S.C.
10   §3742.  If you cannot afford to take an appeal, you may ask to
11   do so at public expense by applying for leave to appeal in
12   forma pauperis.  If you request it, the Clerk of Court will
13   prepare and file a notice of appeal on your behalf.  If you
14   wish to appeal, you must do so within the fourteen-day time
15   period allowed by Rule 4(b) of the Federal Rules of Appellate
16   Procedure.  You've got fourteen days.  So -- to at least get
17   that notice of appeal filed.
18        Okay.  So, what else do I have from the Government's
19   perspective?  Anything else?
20        MS. CRAIL:  I -- just the -- I think we've already
21   provided preliminary orders of forfeiture pursuant to --
22        THE COURT:  I'm going to sign whatever forfeiture
23   orders are submitted to me.
24        MS. CRAIL:  Okay.  I think that's --
25        THE COURT:  I think we've already discussed that.

1          MS. CRAIL:  Okay.

2          THE COURT:  Mr. Crawford, anything?

3          MR. CRAWFORD:  No.

4          THE PROBATION OFFICER:  Nothing further, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          THE CLERK:  All rise.  This matter is now adjourned

7    subject to call.

8       (Proceedings concluded at 2:29 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX**

2

Page

3    GOVERNMENT'S SENTENCING RECOMMENDATIONS: Ms. Crail        35

4    DEFENDANT'S SENTENCING RECOMMENDATIONS: Mr. Crawford      39

5    DEFENDANT'S ALLOCUTION                                    41

6    COURT'S COMMENTS                                          52

7    IMPOSITION OF SENTENCE                                    59

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 **CERTIFICATE**

2 I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3 entitled matter.

4

5      /s/ D. Kathleen Stegmiller               03/17/2012
D. Kathleen Stegmiller, Transcriber              Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25